United States District Court
Southern District of Texas
**ENTERED**
July 08, 2016
David J. Bradley, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| MUTUAL OF OMAHA BANK, | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:15-CV-01598 |
| | § | |
| WILLIAM JOHNSON MAYER, | § | |
| *Defendant.* | § | |

**MEMORANDUM OPINION AND ORDER**

This breach of contract action is before the Court on Bank's motion to dismiss Mayer's amended counterclaims. Dkt. 31. After reviewing the briefing and the law, the Court grants the motion.

**BACKGROUND**

On November 12, 2015, this Court issued a memorandum and order granting Bank's motion to dismiss Mayer's counterclaims (Dkt. 10) and allowing Mayer to re-plead. Dkt. 28. In his amended answer, Mayer re-pleads his fraudulent inducement, slander, and slander of title counterclaims. Dkt. 29. Bank filed another motion to dismiss these counterclaims. Dkt. 31. The issues are now fully briefed and ripe for consideration.

**A. Fraudulent inducement counterclaims**

In Count One, Mayer claims that one of Bank's senior energy lenders, Edward Fenk, made fraudulent representations to induce Mayer into executing the loan agreement and subsequent amendment. Mayer repeats from his original pleadings that Fenk promised "additional flexibility" to lure Mayer's business away from his previous lender, Wells Fargo. Dkt. 29, ¶¶ 37–38. This "additional flexibility" included a representation that Bank could "easily close a $12 million loan," though the parties ultimately agreed upon a $10 million credit line,

and assurances that "there would be no change to Mayer's ability to make his own decisions regarding hedging oil and gas." *Id.*, ¶¶ 38–39.

In the amended answer, Mayer explains how his hedging authority changed with Bank. In 2013, Fenk rejected Mayer's request to add oil hedges for 2014–15 because Fenk disagreed with Mayer's assessment of the future price of oil. *See id.*, ¶¶ 39–41. Mayer contends that, had he been permitted to hedge as initially promised, "[he] would have been at least partially insulated from oil's significant devaluation in 2014." *Id.*, ¶ 41.

Mayer also re-pleads his claim that Fenk made fraudulent representations concerning the maturity date of the loan, inducing Mayer into executing the loan amendment by which he pledged an additional $8 million in collateral to secure the loan. Specifically, Mayer alleges that Fenk claimed that the loan was undercollateralized. *Id.*, ¶ 42. Mayer disagreed with Fenk, but was willing to pledge additional collateral if Bank extended the maturity date of the loan by two years. *Id.* Mayer alleges that during several phone calls made in July and August 2014, Fenk "reassured Mayer that [Bank's] loan committee had already approved the two year extension," which would be effectuated after Mayer pledged the additional collateral. *Id.*, ¶¶ 45, 51. No extension was ever made.

### B. Slander and slander of title counterclaims

Mayer re-pleads his slander and slander of title counterclaims based on certain unknown statements allegedly made by Bank to Christie's in New York concerning Mayer's Americana fine art collection. The facts pleaded in support of the slander counterclaim are repeated verbatim in support of the slander of title counterclaim.

Just as he did in his original counterclaims, Mayer alleges that on April or May 2015, Bank contacted Christie's and negligently made "false representations regarding the ownership

of [Mayer's] collection and/or regarding a potential sale of the collection." *Id.*, ¶ 53. Mayer adds

in his amended counterclaims that Bank's false statements damaged Mayer's reputation with the

Americana fine art community, thereby devaluing his Americana fine art collection. *Id.*, ¶ 54.

Specifically, Mayer alleges that Bank's false claims to Christie's ultimately reached the ears of

the Americana art community, causing members of that community to suspect that Mayer was

experiencing financial difficulties and they could thus acquire pieces of his collection at

discounted prices. *Id.* Mayer cites one example of the damages that he suffered. In September

2015, Christie's auctioned a part of Mayer's collection for $300,000, "despite being valued

and/or expected to sell . . . [within] the approximate range of $750,000 to $1.5 million." *Id.*

Mayer does not re-plead his tortious interference counterclaim, and the Court dismissed

with prejudice Mayer's breach of contract and Texas Debt Collection Practices Act

counterclaims. *See* Dkt. 28.

## <u>ANALYSIS</u>

Federal Rule of Civil Procedure 12(b)(6) permits dismissal of an action when the

complaint, on its face, fails "to state a claim upon which relief can be granted." In considering a

12(b)(6) motion to dismiss, the Court must accept as true all well-pleaded facts and view the

allegations in a light most favorable to the non-movant. *Sullivan v. Leor Energy, LLC*, 600 F.3d

542, 546 (5th Cir. 2010). While the complaint is not required to contain detailed factual

allegations, it must plead sufficient facts "to state a claim to relief that is plausible on its face."

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007). Additionally, "a complaint that shows

relief to be barred by an affirmative defense . . . may be dismissed for failure to state a cause of

action." *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050

(5th Cir. 1982). The Court reviews the complaint, documents attached to the complaint, and any

documents accompanying the motion to dismiss that are referenced by the complaint. *Lone Star Fund V (U.S.), LP v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010).

### A. Mayer's fraudulent inducement claims must be dismissed.

To properly plead fraud in Texas, a plaintiff must allege: (1) the defendant made a material representation that was false; (2) the defendant knew the representation was false or made it recklessly without knowledge of its truth; (3) the defendant intended to induce the plaintiff to act upon the representation; and (4) the plaintiff actually and justifiably relied upon the representation and thereby suffered injury. *See Ernst & Young, LLP v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001); *see also Shandong Yinguang Chem. Indus. Joint Stock Co., Ltd. v. Potter*, 607 F.3d 1029, 1032–33 (5th Cir. 2010). A fraudulent inducement claim requires the plaintiff to plead the elements of fraud as well as "an underlying contract which was induced." *Kevin M. Ehringer Enters., Inc. v. McData Servs. Corp.*, 646 F.3d 321, 325 (5th Cir. 2011) (citing *Haase v. Glazner*, 62 S.W.3d 795, 798 (Tex. 2001)).

### i. Mayer cannot establish justifiable reliance on Fenk's representation that the maturity date of the loan would be extended.

Texas courts have long recognized that a party claiming fraud must be reasonably diligent in protecting his interests, and "a failure to do so is not excused by mere confidence in the honesty and integrity of the other party." *DRC Parts & Accessories, LLC v. VM Motori, SPA*, 112 S.W.3d 854, 858 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (citing *Thigpen v. Locke*, 363 S.W.2d 247, 251 (Tex. 1962)). As many Texas appellate courts have held in the context of fraud, "reliance upon an oral representation that is directly contradicted by the

express, unambiguous terms of a written agreement between the parties is not justified as a matter of law."[1]

Mayer pleads that, in executing the loan amendment and pledging the additional collateral, he justifiably relied upon Fenk's representation that the maturity date of the loan would be extended for two years. Assuming that Fenk made such a representation, any reliance upon the representation could not have been justified. Article III of the amendment contains a ratification clause that provides:

> <u>Ratifications</u>. The terms and provisions set forth in this Amendment shall modify and supersede all inconsistent terms and provisions set forth in the Agreement and except as expressly modified and superseded by this Amendment, *the terms and provisions of the Agreement are ratified and confirmed and shall continue in full force and effect*. Borrower and Lender agree that the Agreement, as amended hereby, *shall continue to be legal, valid, binding and enforceable* in accordance with its terms. The terms, provisions, and conditions of any and all of the Loan Documents including the Agreement are *hereby ratified and confirmed in every respect by Borrower* and shall continue in full force and effect.

Dkt. 31-4 at 3 (emphasis added). Section 3.2 clearly and unambiguously ratified the terms of the original agreement, which required payment of the loan in full on or before April 6, 2015. *See* Dkt. 31-2 at 5, 9. The plain language of the amendment in no way modifies this maturity date or otherwise suggests that the date is to be extended.

Mayer's fraudulent inducement claim as it relates to the amendment is based solely upon Fenk's alleged representations that the loan committee agreed to extend the maturity date of the loan. These alleged oral representations are directly contradicted by the express, unambiguous terms of the loan documents. Under Texas law, Mayer could not have justifiably relied upon

---

[1] *See, e.g., DRC Parts*, 112 S.W.3d at 858; *Playboy Enters., Inc. v. Editorial Caballero, SA de CV*, 202 S.W.3d 250, 258 (Tex. App.—Corpus Christi 2006, pet. denied); *DeClaire v. G&B McIntosh Family Ltd. P'ship*, 260 S.W.3d 34, 46–47 (Tex. App.—Houston [1st Dist.] 2008, no pet.); *Miller Global Props., LLC v. Marriott Int'l, Inc.*, 418 S.W.3d 342, 348 (Tex. App.—Dallas 2013, pet. denied).

Fenk's promises in executing the amendment; therefore, Mayer fails to plead a plausible fraudulent inducement claim related to the amendment.

### ii. Mayer fails to state a plausible fraudulent inducement claim based upon Fenk's representation of Bank's willingness to lend $12 million.

Mayer claims that he was fraudulently induced to enter into the original loan agreement by false promises of "additional flexibility," citing Fenk's representation that Bank could lend up to $12 million. Dkt. 29, ¶¶ 38, 50. As the Court noted in its earlier order, "Mayer does not explain how this representation was fraudulent." Dkt. 28 at 4. In the same paragraph in which he labels this representation as false, Mayer acknowledges that he ultimately agreed to "a $10 million credit line with Mayer's initial borrowing base at $7 million." *Id.*, ¶ 38. In his amended pleadings, Mayer no longer admits that he declined to pursue the $12 million option because the accompanying fees were too high, but he continues to omit any explanation as to how Fenk's representation that Bank *could* lend up to $12 million was false. Mayer's own alleged facts clearly show that he knowingly agreed to a $10 million credit line. Without any additional allegations to explain how the promise of flexibility was false, Mayer fails to plead a plausible fraudulent inducement claim based upon promises of "additional flexibility."

### iii. The pleaded facts demonstrate that Mayer expressly ratified the terms of the original loan agreement.

Although a contract procured by fraud is voidable, the fraudulently induced party to the contract can, with certain actions taken after becoming fully aware of the material facts of the fraud, ratify the contract and thereby waive any claims of fraud. *PSB, Inc. v. LIT Indus. Texas Ltd. P'ship*, 216 S.W.3d 429, 433 (Tex. App.—Dallas 2006, no pet.); *Harris v. Archer*, 134

S.W.3d 411, 427 (Tex. App.—Amarillo 2004, pet. denied); *Miller v. Kennedy & Minshew, Prof'l Corp.*, 142 S.W. 3d 325, 342–43 (Tex. App.—Fort Worth 2003, pet. denied).

In support of his claim that the original loan was fraudulently induced, Mayer alleges that Fenk promised him complete control over all oil hedging decisions. Dkt. 29, ¶¶ 39–41. Assuming the pleaded facts to be true, Mayer became aware that he did not have unfettered hedging authority no later than June 2013. *See* Dkt. 29, ¶ 41. Nowhere in the pleadings does Mayer allege that he ever attempted to rescind or otherwise avoid the contract upon learning that his hedging decisions could be (and were) denied by Bank. To the contrary, Mayer continued to borrow from Bank after his hedging request was denied, and in October 2014, he executed the amendment in which he expressly "ratified and confirmed in every respect" the terms, conditions, and provisions of that arrangement. *See* Dkt. 31-4 at 3.

In sum, viewing the allegations in a light most favorable to Mayer, Mayer's own pleadings show that he was fully aware of the alleged fraud at the time he expressly ratified the agreement, and he continued to operate under the terms of that agreement and accept the benefits of the loan arrangement after realizing his hedging decisions were subject to Bank's veto. Thus, Mayer's claim that the original loan agreement was fraudulently procured is barred by ratification, and he does not state a claim to relief on these grounds.[2]

**B. Mayer fails to describe what Bank representatives said to Christie's or explain how those statements were slanderous.**

In Count Two, Mayer claims that Bank committed slander *per quod* by making "material false representations of fact to Christie's Auction House regarding [Mayer's] Americana fine art collection." Dkt. 29, ¶ 53. Mayer contends that Bank "made false representations regarding the

---

[2] Because the Court dismisses these claims on other grounds, it is unnecessary for the Court to address the merger and disclaimer arguments briefed by the parties.

ownership of the collection and/or regarding a potential sale of the collection," causing harm to his reputation within the Americana fine art community and damaging the value of his collection. *Id.*, ¶¶ 53–54. Mayer lifts these allegations directly from his dismissed pleadings. However, Mayer adds his theory that "[o]nce people in the small Americana fine art community knew or suspected that Mayer may be having financial issues due to Plaintiff claiming it owned some of Mayer's art collection," members of that community believed they could acquire other pieces of the collection at reduced prices. *Id.*, ¶ 54. Thus, Mayer concludes, Bank's slander led to an unexpectedly low auction price of one of his Americana pieces. *Id.*

At the hearing, Mayer's counsel elaborated that Christie's told Mayer that it knew a piece of Mayer's art collection was being auctioned in a "distressed atmosphere" because Bank expressed interest in selling it. ERO at 10:56:23. However, apart from stating a bald legal conclusion—that Bank made material false representations of fact to Christie's—Mayer's pleadings do not identify what was said to Christie's or explain how those statements were slanderous. Moreover, Mayer does not describe any plausible connection between Bank's statements to Christie's and the underselling of his artwork at auction. Without these details, Mayer's slander claim is simply too speculative to survive Bank's 12(b)(6) challenge.

**C. Mayer fails to plead the loss of a specific sale.**

In Count Three, Mayer repeats the allegations made in Count Two in support of his slander of title claim. In its order dismissing Mayer's original slander of title claim, this Court emphasized, "The loss of a specific sale is a crucial element—alleging merely 'impaired market value or vendability' is insufficient to establish a slander of title claim." Dkt. 28 at 8 (citing *Davis v. Countrywide Home Loans, Inc.*, 1 F. Supp. 3d 638, 646 n.9 (S.D. Tex. 2014)). The

Court dismissed the original slander of title claim because Mayer failed to plead the loss of a specific sale. *Id.*

Mayer attempts to remedy this deficiency by alleging that one of his art pieces sold for less than the expected auction price. That is not enough. Ultimately, the sale at auction was completed, just not for the price Mayer was hoping for. Mayer does not—and, it appears, cannot—point to the frustration of a single previously pending sale due to Bank's alleged slander. Mayer fails in his second attempt to plead all elements of his slander of title claim.

## <u>CONCLUSION</u>

For these reasons, Bank's motion to dismiss Mayer's amended counterclaims is granted. Mayer's counterclaims are dismissed with prejudice.

Signed at Houston, Texas, on July 7, 2016.

Stephen Wm Smith
United States Magistrate Judge